UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NORMA NIEVES ALVARADO, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, Acting ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> _____ ) | Case No. CV12-10010 AJW <br><br> MEMORANDUM OF DECISION <br> AND ORDER |

**Proceedings**

Plaintiff, proceeding pro se, filed a second amended complaint ("SAC") for damages against Carolyn W. Colvin, Acting Commissioner of Social Security. Pursuant to a stipulation and order striking and dismissing some allegations and claims from the SAC, the only claims remaining in this action are plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") alleging that while plaintiff was employed by the Social Security Administration (the "SSA"), she: (1) was subjected to a hostile work environment by a coworker based on her race or national origin as "Hispanic"; and (2) was constructively discharged in September 2005 due to a hostile work environment created by the coworker.

Defendant timely filed a motion for summary judgment and supporting documents.[1] [Docket

---

[1] At defendant's request, those documents were filed under seal because they "include information regarding action taken by the [SSA] regarding an employee who is not a party to this action." [Dkt. No. 67 at 2]. Consistent with the sealing order, defendant's motion

("Dkt.") Nos. 69-71]. Plaintiff did not file opposition to the motion.

**Summary judgment standard**

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

"A party asserting that a fact cannot be or is genuinely disputed must support" that assertion by "citing to particular parts of materials in the record," such as depositions, documents, and affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). Alternatively, the party may support that assertion by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)&(B).

The moving party bears the initial burden of production, that is, the burden of identifying the claim or defense as to which summary judgment is sought and the evidence which it believes demonstrates the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party also bears the ultimate burden of persuading the court that there is no genuinely disputed material fact for trial. Nissan Fire & Marine Ins., 210 F.3d at 1102. "Material facts are those which may affect the outcome of the case." Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing Anderson, 477 U.S. at 248). "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." Long, 442 F.3d at 1185.

"A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine Ins., 210 F.3d at 1102. In that situation, the moving party "may carry its initial burden of production by either of two methods." Nissan Fire & Marine Ins., 210 F.3d at 1106. The moving party "may produce evidence negating an essential element of [plaintiff's] case, or, after suitable discovery, [defendants] may show that [plaintiff] does not have enough evidence of an essential

---

and supporting documents are unsealed to the extent necessary to present the factual findings on which this order is based.

2

1  element of its claim or defense to carry [his] ultimate burden of persuasion at trial." Nissan Fire & Marine
2  Ins., 210 F.3d at 1106; see Celotex Corp., 477 U.S. at 320, 325, 328.

3       "If a moving party fails to carry its initial burden of production, the nonmoving party has no
4  obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion
5  at trial." Nissan Fire & Marine Ins., 210 F.3d at 1102-1103; see Adickes v. S. H. Kress & Co., 398 U.S.
6  144, 160 (1970). If, however, a moving party without the burden of persuasion at trial carries its initial
7  burden of production, "the nonmoving party must produce evidence to support its claim or defense." Nissan
8  Fire & Marine Ins., 210 F.3d at 1103; see Fed. R. Civ. P. 56(c)&(e); Celotex Corp., 477 U.S. at 322, 324;
9  Anderson, 477 U.S. at 256. "If the nonmoving party fails to produce enough evidence to create a genuine
10 issue of material fact, the moving party wins the motion for summary judgment. But if the nonmoving party
11 produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the
12 motion." Nissan Fire & Marine Ins., 210 F.3d at 1103.

13      "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed,
14 and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552
15 (1999) (quoting Anderson, 477 U.S. at 255); see Brosseau v. Haugen, 543 U.S. 194, 195 & n.2 (2004) (per
16 curiam) (stating that for purposes of a summary judgment motion, "we are required to view all facts and
17 draw all reasonable inferences in favor of the nonmoving party"). Summary judgment may not be granted
18 if the evidence, construed in the light most favorable to the nonmoving party, would permit a rational trier
19 of fact to find in that party's favor. See Anderson, 477 U.S. at 248.

20      Rule 56 provides that if a party "fails to properly address another party's assertion of fact as required
21 by" Rule 56(c), the court may "consider the fact undisputed for purposes of the motion" and may "grant
22 summary judgment if the motion and supporting materials--including the facts considered undisputed--show
23 that the movant is entitled to it." Fed. R. Civ. P. 56(e). The Local Rules authorize the to court to "assume
24 that the material facts as claimed and adequately supported by the moving party are admitted to exist
25 without controversy except to the extent that such material facts": (1) are "included in the 'Statement of
26 Genuine Disputes'" that the party opposing summary judgment is required to file; *and* (2) are "controverted
27
28

by declaration or other written evidence filed in opposition to the motion."[2] C.D. Cal. Local R. 56-3.

Since plaintiff did not file opposition to the motion, the Court may assume that the material facts as claimed and adequately supported by defendant in her Statement of Uncontroverted Facts ("SUF") [Dkt. No. 55-5] are admitted to exist without controversy. Fed. R. Civ. P. 56(e); Local R. 56-3; see Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec, 854 F.2d 1538, 1545 (9th Cir. 1988) (affirming a decision granting summary judgment where the nonmoving party failed to meet its "affirmative burden" under the local rule "to list genuine issues with appropriate record citations in order to withstand" a motion for summary judgment).

**Defendant's SUF**

Defendant contends that the following facts are material and uncontroverted, and that those facts entitle defendant to judgment as a matter of law.

The Court has reviewed defendant's proposed uncontroverted facts and the evidence cited and submitted by defendant in support of her SUF. Defendant has met her burden as the party moving for summary judgment to adequately support her factual contentions by citing to particular parts of materials in the record, including declarations under penalty of perjury, documents, electronically stored information, and plaintiff's deposition transcript. Therefore, the Court finds that the following facts exist without controversy.

Plaintiff began working for the SSA on June 17, 1979. [SUF 1]. Plaintiff became a Contact Representative at the SSA's Los Angeles Teleservice Center ("LATSC") on August 9, 1981 and held that position until she retired in September 2005. [SUF 2, 4, 15]. As a Contact Representative, plaintiff's job duties included fielding customer service phone calls in English or Spanish made to the SSA's customer service phone number. [SUF 3].

---

[2] The local rules are binding on all litigants, including pro se litigants. See C.D. Cal. Local R. 83.2.2.3, 83-2.2.4; Bias v. Moynihan, 508 F.3d 1212, 1219, 1223 (9th Cir. 2007) (stating that a pro se litigant must abide by the local rules, and holding that: (1) the district court did not err in failing to consider a pro se litigant's sur-replies filed in violation of the local rules in opposition to a summary judgment motion; and (2) the district court was under no duty to a pro se litigant to search the record for evidence that would create a factual dispute for purposes of a summary judgment motion).

1    Plaintiff alleges that she witnessed a coworker, James Lee ("Lee"), make fun of another coworker,
2 Mario Vigil ("Vigil"), by saying, "I can't hardly wait until O.I.G. gets rid of that ignorant man with his
3 broken English who think he is a great T.S.R."[3] Plaintiff reported Lee to LATSC management on or about
4 September 2, 1997. [SUF 5; SAC ¶ 11].

5    On or about October 16, 1997, plaintiff filed a written "Report of Contact" with LATSC
6 management complaining that Lee threw training materials at plaintiff before a training session on that date,
7 and that during a break in the training session Lee followed her around while loudly and repeatedly
8 apologizing. [SUF 6; SAC ¶ 13].

9    On or about November 10, 1997, plaintiff filed a written "Report of Contact" with LATSC
10 management complaining that that Lee deliberately walked in front of her while she was pushing a chair
11 on that date, said things to her in a foreign language ("possibly Phillippino [sic]") , grunted at her, and
12 walked up behind her and uttered the word "Umphta" in her ear. [SUF 7; SAC 14].  Plaintiff also
13 complained that when she asked Lee why he did that, he responded by saying, "Great, Norma, go ahead and
14 make a scene in front of Bob," the LATSC manager. [SUF 7; SAC 14].

15    On or about January 15, 1998, plaintiff filed a written "Report of Contact" with LATSC management
16 complaining that that on January 14, 1998,  after she replied in Spanish to a work-related question asked
17 by a coworker in Spanish, Lee asked their supervisor, Jean Kareckas, "is Social Security Administration an
18 equal opportunity employer?" [SUF 8; SAC ¶ 15].

19    On or about March 16, 1998, plaintiff filed a written "Report of Contact" with LATSC management
20 complaining that Lee made a sneering face at plaintiff and made a noise that sounded like "oof." [SUF 9;
21 SAC 16].

22    On or about March 18, 1998, plaintiff filed a written "Report of Contact" with LATSC management
23 requesting that Lee be prohibited from walking by her work station and that he be required to stay out of
24 her work area. [SUF 10].

25    On or about April 22, 1998, plaintiff filed a written "Report of Contact" with LATSC management
26 complaining that plaintiff was standing in a circle with two other coworkers talking when Lee walked right

---

[3]    Plaintiff alleged Lee's and Vigil's name in her original complaint, first amended complaint, and SAC, so that information is part of the public record and is not under seal.

5

in front of her, through the circle rather than around it, and interrupted plaintiff by greeting the coworker plaintiff was speaking to but not plaintiff. [SUF 11; SAC ¶ 18].

On July 14, 1998, plaintiff filed a written "Report of Contact" with LATSC management complaining that on July 13, 1998, plaintiff was talking with a coworker when she heard Lee say to another coworker, "I saw slob-o-la over there," and "I cannot wait until they get rid of that thing." [SUF 12; SAC ¶¶ 20-21].

Between June 20, 2002 and her retirement from SSA in September 2005, plaintiff complained to LATSC management about Lee's conduct.[4] [SUF 13].

On June 28, 2005, plaintiff applied for early retirement. [SUF 14]. Plaintiff retired from the SSA on September 30, 2005. [SUF 15].

**Hostile work environment claim**

Title VII states that "[a]ll personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16. "Executive agency" means an executive department, a government corporation, and an independent establishment. 5 U.S.C. § 105. As "an independent agency in the executive branch" of the federal government, 42 U.S.C. § 901(a), the SSA qualifies as an "executive agency."

Title VII's prohibition against discrimination in employment "encompasses the creation of a hostile work environment, which violates Title VII's guarantee of 'the right to work in an environment free from discriminatory intimidation, ridicule, and insult.'" McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1112 (9th Cir. 2004)(quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)).

"In order to prevail in a Title VII case, the plaintiff must establish a prima facie case of discrimination." Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2004) (as amended); see Craig v. M &O Agencies, Inc., 496 F.3d 1047, 1055 (9th Cir. 2007). To make out a prima facie hostile work environment claim, plaintiff must show by direct or circumstantial evidence that: (1) that [she] was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive [so as] to alter the conditions of the plaintiff's

---

[4] Defendant's SUF details the nature of the complaint and the alleged conduct by Lee, but that part of the SUF remains under seal.

6

employment." Vasquez, 349 F.3d at 642; see Craig, 496 F.3d at 1055; Galdamez v. Potter, 415 F.3d 1015, 1023 (9th Cir. 2005).[5]  In order to satisfy the third element of this test, she must show that her work environment was both subjectively and objectively hostile. Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1034 (9th Cir. 2005).  To meet the subjective prong, plaintiff "must show that she perceived her work environment to be hostile . . . ." Dominguez-Curry, 424 F.3d at 1034.  To meet the objective prong, plaintiff must show that a reasonable woman belonging to her racial and ethnic group would perceive the environment as hostile. Dominguez-Curry, 424 F.3d at 1034; Galdamez, 415 F.3d at 1023.

In analyzing whether the alleged conduct created an objectively hostile work environment, courts must assess all of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Dominguez-Curry, 424 F.3d at 1034 (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–271 (2001)); Vasquez, 349 F.3d at 642.  "The required severity of the conduct varies inversely with its pervasiveness and frequency." Galdamez, 415 F.3d at 1023 (citing McGinest, 360 F.3d at 1113).

Title VII, however, is not a "general civility code" and does not apply to "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. . . . [C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . . " Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Dominguez-Curry, 424 F.3d at 1034 (internal quotation marks omitted) (quoting Faragher, 524 U.S. at 788).

Defendant contends that plaintiff cannot establish that she was subjected to racially discriminatory conduct because Lee's conduct, while rude, did not directly or indirectly target her due to her Hispanic race. Viewed in the light most favorable to plaintiff, the undisputed facts demonstrate only two remarks by Lee that provide direct or circumstantial evidence of discrimination based on race or national origin, and only one of those may reasonably be understood to concern plaintiff directly.

---

[5] Plaintiff's claim that she "was discriminated against because [she] was Hispanic is actually a race based claim." Vasquez, 349 F.3d at 642 n.20.

7

1          Lee's first such remark described another coworker as "that ignorant man with his broken English
2   who thinks he is a great T.S.R." [SUF 5].  While that remark disparaged Vigil's English-language skills
3   rather than overtly referenced his Hispanic race or his national origin, the phrase "broken English" is
4   reasonably understood referring to a non-native English speaker and "carries the distinct tone of racial
5   motivations and implications."  McGinest, 360 F.3d at 1116-1117 (explaining that the use of "code words"
6   can violate Title VII) (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)).
7   However, there is no evidence from which a reasonable juror could infer that Lee's "broken English" remark
8   was directed at or intended to apply to plaintiff.  To make out the first element of her prima facie case,
9   plaintiff must show that "*she* was subjected to verbal or physical conduct *because of her race*."  Manatt v.
10  Bank of America, N.A., 339 F.3d 792, 798 (9th Cir. 2003) (italics added).  Lee's "broken English" remark
11  fails to create a triable factual dispute on this element of plaintiff's prima facie case.

12         That conclusion is borne out by plaintiff's own description of the incident to LATSC management.
13  Plaintiff wrote that Lee stopped three other coworkers "and in a very loud disrupting voice was directing
14  them to listen to his sarcastic and degrading comments intended towards [Vigil]."  Without saying Vigil's
15  name, and before saying anything about his "broken English," Lee looked at Vigil and called him "ignorant"
16  and "a moron" for "playing with [a] stupid toy."   Plaintiff wrote that Lee's "sarcastic comments about
17  [Vigil]" and that Lee's "harassing of [Vigil] . . . upset me," but she did not say or imply that she felt that Lee
18  was harassing *her* on account of her race or national origin.  Instead, plaintiff noted that after she asked Lee
19  to lower his voice and told him that his remarks about Vigil were "offensive to me" and "mean," Lee
20  "threatened" her by repeatedly telling that her she should "stay out of this if you know what's good for you."
21  Plaintiff said that she considered Lee's comments "an effort . . . to instill fear and to disrupt the efforts of
22  those of us who are here to provide good service to our callers," decried Lee's harassment of Vigil "and
23  others," and asked her supervisor to resolve "whatever conflict exists between [Lee and Vigil] because
24  [Lee's] disturbing actions interfere with SSA's commitment to provide all its employees safe working
25  conditions." [Defendant's Evidentiary Appendix ("Appendix"), Declaration of Celia Eng ("Eng Decl."),
26  Exhibit ("Ex.") 5].

27         Viewed most favorably to plaintiff, Lee's statement disparaging Vigil's "broken English" does not
28  create a reasonable inference that Lee directed verbal conduct that was racial in nature at plaintiff or

1  subjected her to verbal conduct because of her race or national origin. See Edwards v. Dep't of State Hosp.
2  (DHS)-Coalinga, 2014 WL 1664980, at *6 (E.D. Cal. Apr. 24, 2014) (dismissing a second amended
3  complaint with prejudice where the plaintiff "alleged some comments by co-workers [that] were racist in
4  nature," but no "comments showing racial animus were directed to [the plaintiff] personally," and most of
5  "the comments that were alleged were only tangentially racial in nature, if at all, and were directed to
6  situations in which [the plaintiff] was not involved").

7  　　　Lee's other remark that implicated race occurred after he overheard plaintiff answer a coworker's
8  question in Spanish and asked a supervisor whether SSA was an "equal opportunity employer." Lee's
9  comment to his supervisor was not a racial epithet and at least superficially concerned not her status as a
10 Hispanic but her conduct in choosing to answer a work-related question from a coworker in Spanish. See
11 Kang v. U. Lim Am., Inc., 296 F.3d 810, 817 (9th Cir. 2002) ("Generally, a plaintiff alleging racial or
12 national origin harassment would present facts showing that he was subjected to racial epithets in the
13 workplace."). Viewing that remark in the light most favorable to plaintiff, however, it was impliedly racial
14 in nature and creates a triable issue of fact as to the first element of her prima facie case.

15 　　　Lee's other undisputed conduct toward plaintiff included throwing papers at her, interrupting or
16 ignoring her, using derogatory but race-neutral terms about her, and engaging in unsanctioned conduct as
17 described in defendant's evidence filed under seal.  While that conduct was rude, disrespectful, and
18 disruptive, there is no evidence in the record from which a reasonable juror could infer that such conduct
19 by Lee was motivated by racially discriminatory animus. See Faragher, 524 U.S. at 787 (stating that
20 "discourtesy or rudeness should not be confused with racial harassment") (quoting 1 B. Lindemann & P.
21 Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed.1996)); Fields v. Riverside Cement
22 Co., 226 Fed. Appx. 719, 2007 WL 900983, at *4 (9th Cir. Mar. 27, 2007) (affirming summary judgment
23 on the plaintiff's Title VII harassment claim in favor of the defendant where the plaintiff "offered no
24 evidence that any of the acts in question were 'of a racial nature,'" and noting that the court "cannot attribute
25 a racial motivation to [the defendant's employee's] behavior based solely on [the plaintiff's] opinion . . .
26 that [the defendant's employee] is racist") (citing Aramburu v. Boeing Co., 112 F.3d 1398, 1408 & n.7 (10th
27 Cir. 1997) (affirming summary judgment on the plaintiff's hostile work environment claim in the
28 defendant's favor where the plaintiff did not present sufficient evidence from which a reasonable jury could

find that the plaintiff was harassed because of his ancestry, and noting that evidence that the plaintiff and other employees subjectively believed they were discriminated against was not sufficient to preclude summary judgment) Al-Raheem v. Care, 2012 WL 2116530, at *4 (E.D. Cal. June 11, 2012) (stating that where the alleged conduct was "harassing and abusive" but "is not racial in nature, a court cannot conclude the conduct was racially motivated simply on the basis of Plaintiff's suspicions or on the opinions of coworkers," and dismissing a Title VII hostile work environment claim) (citing Fields, 226 Fed. Appx. at 724; Rosa v. Scottsdale Mem. Health Systems, Inc., 132 F.3d 38, 1997 WL 753359, at *1 (9th Cir. 1997) (affirming summary judgment in the defendant's favor on a Title VII hostile work environment claim where "almost all of the incidents [the plaintiff] cites as creating a hostile work environment were not racial in nature. The only incident that was racially charged by its very nature was the telling of the racial joke.")); Edwards, 2014 WL 1664980, at *6 (holding that allegations of "unwelcome conduct by supervisors and/or co-workers" that as not "expressly racial" or "racist in nature" were insufficient to state a hostile work environment claim).

Defendant also contends that even if both Lee's "broken English" remark and his "equal opportunity employer" remark are construed as racially discriminatory conduct and are considered along with Lee's other conduct, plaintiff cannot show a triable issue of fact as to whether the conduct so severe or pervasive that is altered her conditions of employment.

Defendant is correct. For purposes of showing "severe or pervasive" conduct creating an objectively hostile work environment, plaintiff may rely not only on Lee's verbal or physical conduct that was racial in nature and directed at her personally, but also on conduct that was motivated by race or national origin and directed at others. See McGinest, 360 F.3d at 1117-1118 ("[I]f racial hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff. . . . If racial animus motivates a harasser to make provocative comments in the presence of an individual in order to anger and harass him, such comments are highly relevant in evaluating the creation of a hostile work environment, regardless of the identity of the person to whom the comments were superficially directed.") (citing Woods v. Graphic Commmc'ns, 925 F.2d 1195, 1202 (9th Cir. 1991) (holding that the workplace atmosphere "was unquestionably polluted" where the plaintiff "was surrounded by racial hostility, and subjected directly to some of it")).

1       Even under this standard, however, the undisputed facts would not permit a reasonable juror to find
2 the kind of "extreme conduct" that can create an objectively hostile work environment so as to satisfy the
3 third element of plaintiff's Title VII prima facie case. Faragher, 524 U.S. at 788. First, Lee's racially
4 discriminatory conduct was isolated and infrequent. He made the "broken English" remark about Vigil in
5 August 1997 and the "equal opportunity employer" remark about plaintiff in January 1998. See Faragher,
6 524 U.S. at 788 (stating that "sporadic use of abusive language" would not amount to a change in the terms
7 and conditions of employment"); Vasquez, 349 F.3d at 642-644 (affirming summary judgment on the
8 ground that a supervisor's discriminatory conduct was not severe or pervasive enough to create a hostile
9 work environment where, within a one-year period, the supervisor told the plaintiff, a youth detention center
10 officer, that he had "a typical Hispanic macho attitude" and should transfer jobs because "Hispanics do good
11 in the field," yelled at the plaintiff twice in front of detainees, made negative remarks about him to
12 detainees, and wrote two memos to superiors complaining about the plaintiff) (citing Sanchez v. City of
13 Santa Ana, 936 F.2d 1027, 1031, 1036 (9th Cir. 1990) (affirming the trial court's directed verdict finding
14 that no reasonable factfinder could have found a hostile work environment despite evidence that the
15 employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing
16 rules, provided unsafe vehicles to Latinos, did not provide adequate police backup to Latino officers, and
17 kept illegal personnel files on the plaintiffs because they were Latino); Kortan v. California Youth Auth.,
18 217 F.3d 1104, 1108, 1110-1112 (9th Cir. 2000) (affirming summary judgment on the ground that no hostile
19 work environment existed where the supervisor called female employees "castrating bitches," "Madonnas,"
20 or "Regina" on several occasions in the plaintiff's presence, called the plaintiff "Medea," directed hostile
21 stares at her, laughed at her, ridiculed her to other employees, rated her performance lower than in past
22 evaluations, and criticized her more)).

23       Second, the discriminatory conduct, while offensive, was not severe. Although Lee's remarks had
24 an overtone of discrimination based on race or national origin, they were not overt racial slurs. Even overtly
25 racial remarks may not be severe enough to create an objectively hostile work environment because "[m]ere
26 utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not
27 sufficiently alter terms and conditions of employment to violate Title VII." Faragher, 524 U.S. at 787
28 (internal quotation marks omitted) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971), cert.

11

denied, 406 U.S. 957 (1972)); Vasquez, 349 F.3d at 644 (holding that alleged verbal harassment that included "only two racially related epithets" did not create a triable factual dispute regarding the existence of a hostile work environment).

Third, the discriminatory conduct was not "physically threatening or humiliating," but rather was "a mere offensive utterance . . . ." " Dominguez-Curry, 424 F.3d at 1034; see Kortan, 217 F.3d at 1111 (holding that no hostile work environment existed as a matter of law where a supervisor's utterances were "just offensive"); cf. Laying v. Twin Harbors Grp. Home Ass'n, 2006 WL 197127, at *6 (W.D. Wash. Jan. 24, 2006) (holding that no hostile work environment existed as a matter of law where the female plaintiff "suffered no physically threatening or humiliating conduct at the hands of [a male supervisor]," whose "advances . . . were neither overtly sexual nor objectively offensive, even if they were unwelcome").[6]

Fourth, the evidence does not support an inference that Lee's racially discriminatory remarks *unreasonably* interfered with plaintiff's work performance. Dominguez-Curry, 424 F.3d at 1034 (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–271 (2001)); Vasquez, 349 F.3d at 642. The undisputed facts create an inference that Lee's conduct, including both his racially discriminatory remarks in 1997 and 1998 and his offensive but not demonstrably racist conduct between 1997 and 2005, subjectively interfered with plaintiff's work performance, in that she complained repeatedly about his conduct and its effect on her in writing and eventually sought relief through formal administrative channels.[7] On the record before the Court, however, no reasonable juror could find that Lee's discriminatory remarks unreasonably interfered with plaintiff's work performance so as to raise a triable issue of fact on the existence of a hostile work environment as a result of racial discrimination. Lee made those discriminatory remarks in August 1997 and January 1998. Plaintiff remained in her job as a Contact Representative at

---

[6] "Because the elements to prove a hostile work environment are the same for both racial harassment and sexual harassment, cases analyzing both types of harassment are relevant to [the court's] analysis." Vasquez, 349 F.3d at 642.

[7] Defendant's evidence as to the nature and results of that administrative action are sealed. However, plaintiff alleged in the SAC that she filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against Lee that resulted in execution of a settlement agreement in June 2002 that imposed workplace restrictions on Lee's conduct, and that she later filed an unsuccessful complaint with the EEOC alleging violations of the settlement agreement.

12

LATSC until she retired in September 2005. There is no evidence that Lee's conduct impaired her ability to perform her job duties during that time. Defendant's evidence includes a declaration from Leonteen Sarver stating that she was plaintiff's supervisor from 2002 until her retirement in 2005, and that when plaintiff "informed me she was retiring in 2005, I was under the impression it was completely voluntary. [Plaintiff] told me she wanted to return to college to further her education. I was unaware at the time that she felt forced to retire." [Appendix, Sarver Decl., ¶¶ 3, 8]. Accordingly, no genuine factual dispute exists as to this factor.

"[N]ot all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII." Meritor Sav. Bank, 477 U.S. at 67. The undisputed facts demonstrate conduct that "falls far short of the severity of conditions where [the Ninth Circuit] has allowed hostile work environment claims to proceed." Laying, 2006 WL 197127, at *5 (citing E.E.O.C. v. National Educ. Ass'n, Alaska, 422 F.3d 840, 843 (9th Cir. 2005) (finding a triable issue as to whether a hostile work environment existed where a supervisor frequently shouted profanities at female employees and acted in a physically threatening manner); Kang, 296 F.3d at 814, 817 (reversing summary judgment for the employer on a hostile work environment claim where the plaintiff's supervisor verbally and physically abused the plaintiff because of his race by screaming profanity at the plaintiff for up three hours a day, striking him in the head with a metal rule, kicking him in the shins, pulling his ears, throwing objects at him, and forcing him to do "jumping jacks"); Nichols v. Azteca Rest. Enters., 256 F.3d 864, 872-873 (9th Cir. 2001) (reversing the trial court's judgment in favor of the employer on a hostile work environment claim following a bench trial where the male plaintiff was called "faggot" and "fucking female whore" by coworkers and supervisors at least once a week and often several times a day); Draper v. Coeur Rochester, 147 F.3d 1104, 1105-1106, 1109-1110 (9th Cir. 1998) (holding that a genuine factual dispute existed as to the existence of a hostile work environment where plaintiff's supervisor made repeated sexual remarks to her, told her of his sexual fantasies and desire to have sex with her, commented on her physical characteristics, and asked over a loudspeaker if she needed help changing her clothes)). Accordingly, defendant has shown the absence of a triable factual dispute as to whether Lee's conduct was sufficiently severe or pervasive to alter plaintiff's working conditions and create an objectively hostile work environment.

Defendant has met her burden as the party moving for summary judgment to show the absence of evidence supporting the elements of plaintiff's prima facie case for a hostile work environment in violation of Title VII. Therefore, defendant is entitled to summary judgment on that claim.

**Constructive discharge**

To establish a prima facie case for a Title VII "hostile-environment constructive discharge claim," plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004). "In order to survive summary judgment on a constructive discharge claim, a plaintiff must show there are triable issues of fact as to whether a reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminatory working conditions.'" Hardage v. CBS Broad., Inc., 427 F.3d 1177, 1184 (9th Cir. 2005), amended on denial of reh'g, 433 F.3d 672 (9th Cir. 2006), amended on denial of reh'g, 436 F.3d 1050 (9th Cir. 2006).

A "constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." Poland v. Chertoff, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting Brooks v. City of San Mateo, 229 F.3d 917, 930 (9th Cir. 2000)). "We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." Poland, 494 F.3d at 1184.

"Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." Brooks, 229 F.3d at 930. Because plaintiff cannot establish that she was subjected to a hostile work environment in violation of Title VII, defendant is entitled to summary judgment on plaintiff's constructive discharge claim.

///

///

14

**Conclusion**

Defendant's summary judgment motion is **granted**, and this case is **dismissed with prejudice.**

 **IT IS SO ORDERED.**

January 28, 2016
_____
ANDREW J. WISTRICH
United States Magistrate Judge